**GENERAL AEROSOLS, INC., Appellant,**

v.

**AMERICAN HOME PRODUCTS CORPO-
RATION, Appellee.**

**Patent Appeal No. 6928.**

United States Court of Customs
and Patent Appeals.

June 20, 1963.

James T. Kline, Bridgeport, Conn., for appellant.

Mortimer Altin, New York City, for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This cause is a consolidation of Opposition No. 39,449 and Cancellation No. 7,419. This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board sustaining the opposition and granting the petition to cancel, 132 USPQ 71.

The two proceedings relate to the same trademark as follows:

**aeromagic**

Appellant applied for registration of this mark, application Ser. No. 73,782, filed May 15, 1959, for "Aerosol Packaged Starch," claiming first use on September 24, 1958. Appellee filed opposition on November 12, 1959. Appellant already had registration No. 688,097 issued November 10, 1959, of the identical mark for "Aerosol Packaged Tar Remover, and Dust Laying Compounds Comprising an Oil Base Dust Spraying Composition" claiming the same date of first use as for the starch. Appellee filed a petition to cancel that registration on December 4, 1959.

It will be observed that all of appellant's products are "aerosol packaged" which we take to mean that they are put up in the now commonplace "aerosol"

pressurized cans and are used by being sprayed from the cans by pressing the button on the top of the can which contains a spray nozzle from which the contents of the can are expelled. As will be remembered by all but the very young, this method of packaging is of relatively recent origin. The word "aerosol" does not appear in dictionaries of 1931 vintage. In Webster's New Collegiate Dictionary (1956) it is defined as "A suspension of fine solid or liquid particles in air or gas, as smoke, fog, or mist." The prefix or combining form "aero-," however, is very ancient and is defined in the same dictionary thus: "A combining form denoting: *a* Air, aerial, as in aerophotography. *b* Gas or gases, as in *aero*therapeutics."

Appellant took no testimony. The only information we have on its mark and its manner of use is contained in the registration and the parts of its applications made available to us. The specimens filed therewith are informative. The specimen in the file of the registration of "aeromagic," which was furnished to us at the oral argument by appellee, is a label for the dust laying compound and shows it to be an aerosol package of a product called "RID-O-DUST" to be sprayed on dust cloths and mops. The mark "aeromagic" is printed at the top of the label and the aforesaid product designation appears beneath it in more prominent type in white letters on a large black disk. The specimen reproduced in the record from the application being opposed is in similar format, "aeromagic" appearing at the top of the label and in a disk of dark color beneath it appear words designating the product as "PUSH-BUTTON STARCH," these words being in type larger than the trademark.

Viewing the trademark "aeromagic" in the context of its use, we believe the impression on the average purchaser would be that the "RID-O-DUST" or "PUSH-BUTTON STARCH" or the tar remover, however it may be designated, is an aerosol product with "magic" properties. Mere inspection of the can would make it obvious that it is an aerosol can and we do not see how the connection between that fact and the syllable "aero" could be escaped; "-magic" is a laudatory term indicative of desirable properties calculated to lighten housework or the like— an Aladdin's lamp impression. The mark "aeromagic" functions, apart from the suggestiveness above indicated, solely as an origin indicator, that is to say the identification of the product in the can is left to other words and cannot be determined from the mark. Other words are in fact used to advise the purchaser what the product is.

In analyzing appellant's "aeromagic" mark, opposer-petitioner says that the "aero" portion of it is "arbitrary." We think that is obviously not the case. The basis for opposer's position is twofold: that it has not been shown in this case that any product under consideration has any connection with air (accepting "aero" as denoting a reference to air); and that it has not been shown that the public recognizes "aero" as indicating an aerosol product. We recognize that some unknown portion of the public may not know the technical or dictionary definition of "aerosol" but we cannot go much beyond that. We believe any literate person comprehends that "aero" has some reference to air. The common aerosol package, also frequently referred to as a spray-can, necessarily sprays its contents into the air, either for ultimate use or in the course of being projected upon some object. Appellant's two labels contain drawings showing the starch being sprayed onto garments and the duster spray being sprayed onto dusters, mops, and furniture. It would be an obtuse person indeed who failed to connect "aeromagic" on these aerosol can labels with an air spray. We think the idea of spraying liquid particles into the air would be associated by purchasers with the "aero" portion of appellant's mark, and that is the idea of aerosols whether or not the observer knows the word

"aerosol" or its definition. In case he does not know the word, he does not have far to look, for at the bottom of the label under the pictures and directions in prominent type is the statement "Product of General Aerosols, Inc." In addition, we are sure there is a large segment of purchasers which is familiar with the word "aerosol" and has a general idea of its meaning. Both parties to the case seem to have proceeded on an assumption that the meaning of the term "aerosol packaged" in the application and registration would be understood, no attempt being made to explain it.

On the basis of the foregoing reasoning it is our view that the "aero" portion of appellant's mark "aeromagic" has a highly suggestive significance verging on descriptiveness when used on an aerosol packaged product. In resolving the issues before us, we think this is important.

The opposer-petitioner relies on registrations and prior uses of various predecessors in business, A. S. Boyle Company and Midway Chemical Co., which merged to form Boyle-Midway Inc., now the manufacturer of the products here involved which are sold by the Boyle-Midway Division of American Home Products Corporation which owns Boyle-Midway Inc. We will take up the marks upon which appellee relies separately.

First is the registered trademark "AERO," in which the "O" is larger than the other letters, for mops, first used in 1931 by Midway Chemical Company and registered by it in 1937, Reg. No. 345,361. *Use* of "AERO" as a trademark for household cement for mending wood, metal or paper commenced in 1946 and as a trademark for cleaning fluid and spot remover commenced in 1956. It does not appear to have been registered for these uses which appear to be continuing. Appellant has not questioned these uses, the extent of which the record does not show. We do not believe that the concurrent use of "AERO" and "aeromagic" on the goods above mentioned, no other special circumstances having been shown, would be likely to cause confusion, mistake or deception of purchasers.

Appellee cites our recent decision in Clinton Detergent Company v. Proctor & Gamble Company, 302 F.2d 745, 49 CCPA 1146, in support of its contentions that "AERO" is a strong trademark which appellant uses in its entirety as the dominant part of "aeromagic." We cannot agree that "aero" is the dominant part of that mark. In fact, if the suggestiveness of the first syllable is appreciated, then "magic" would seem to be dominant. But in any event, the Clinton case was factually quite different. We there found that the trademark JOY, an ordinary English word often adopted by others as or in trademarks, had acquired "great distinctiveness" by reason of several million dollars a year spent on advertising it, specifically, for several years. On that basis we found that the applicant's use of CARJOY would be likely to create the impression that it had the same origin as JOY. In the instant case the common combining form "AERO" is shown to have been registered for mops and also to have been used for mending cement and cleaning fluid spot remover. The record is silent on the extent of such use, the sales of such products, or the amount, if any, spent in advertising them. Appellee's single witness, a Vice President in charge of sales, testified as to a number of other products sold at one time or another under the "AERO" mark but long since discontinued for insufficient sales volume or profits, including furniture polish, after-shave lotion, hand lotion, paint cleaner, dance wax, rug cleaner, and scratch remover. We quote his testimony:

"Q40. These products that you have mentioned, that are sold by Boyle-Midway, have they been advertised through the years to the general public? A. Oh, yes, some of them very heavily advertised.

"Q41. Have they all been advertised? A. No, not all of them." Although the testimony was that a total of about $20 million had been spent on advertising appellee's products in the fifteen-year period 1944–1959, running, in 1960, at the rate of $3 million a year, the record shows this expenditure to be primarily on products we have not yet mentioned and it does not actually show any spent on the products so far discussed sold under the "AERO" trademark, registered only for mops. On this showing we do not see a parallel with the Clinton case. Also cited is Purex Corporation Ltd. v. Maryland Paper Products Co., 287 F.2d 186, 48 CCPA 848, to support a suggestion that a housewife would be likely to associate an "AERO" mop with "aeromagic" dusting compound. In the Purex case, however, what we decided was that the use of *identical* trademarks (SWEETHEART) on soap and paper products, including paper towels, toilet tissue, and facial tissue, would be likely to confuse purchasers as to source. The marks so far considered are far from identical.

The next mark of appellee to be considered is one of its most important. It was first used by Midway Chemical Co. in 1932 and registered to it July 19, 1938, Reg. No. 358,637, for "wax polish." The mark is AEROWAX, one word, the "O" being larger than the other letters. The product is, appellee's witness testified, "a no rubbing liquid floor wax for all kinds of floors." The can labels describe it as self-polishing floor wax and contain a background suggestive of flying. It is not an aerosol product but is wiped on the floor and allowed to dry. This is one of opposer's major products, so far as this case is concerned, the subject of a major proportion of the advertising expenditures and currently selling at a rate in excess of $10 million a year.

Appellee would evidently like us to regard this trademark as an "AERO" mark attached to the purely descriptive word "wax." We do not so regard it. The mark is "AEROWAX" (with a big "O"), a unitary thing, at one and the same time serving as an origin indicator and to designate what the product is— at least generically. We do not think that "AEROWAX" (with a big "O") *so* resembles "aeromagic" (with a star for the dot of the "i") *that,* when the former is applied to self-polishing liquid wax and associated with a flying motif and the latter is applied to an aerosol-packaged product for starching clothes, removing tar, or laying dust, it would be likely to cause confusion, mistake, or deception of purchasers. However marks may be taken apart in the process of discussing them, the ultimate opinion on likelihood of confusion, which is the controlling factor, must be based on a consideration of the marks as a whole. The marks are very different in appearance and call forth entirely different associations.

The next mark is "AEROMIST" (again with a big "O").[1] Midway Chemical Co. adopted it in 1936 and it was registered June 21, 1938, Reg. No. 357,979, for "Glass Cleaning Preparation." A related registration of the word in plain capital letters,[1] No. 583,763, December 22, 1953, is on a hand-operated sprayer, issued to Boyle-Midway Inc. Of these two the witness said the "AEROMIST" is a glass cleaner for cars, mirrors, and glass surfaces, and that the sprayer was for spraying it "on the windows." Business in this item is running "in excess of $100,000" a year. This whole mark in both of its syllables is fairly suggestive of a liquid sprayed into the air in the form of a mist and, while perhaps the closest in sound of all appellee's marks to appellant's "aeromagic," we believe that confusion would not be likely to result from concurrent use of the two marks on the involved products, considering differences in form of the marks, sound of the marks, the thoughts

1. We refer to the mark as registered. In use it appears to have been changed at some unknown time to slant lettering with a wing over the "O."

suggested thereby and the association between the "aero" portion of appellant's mark and aerosol packaging.

The other big seller among appellee's relevant products is "AERO SHAVE" (the first word positioned above the second), adopted 1952, registered by Boyle-Midway Inc. July 20, 1954, Reg. No. 592,842, for "Aerosol Packaged Shaving Cream." This is the first aerosol product we have come to among appellee's products. This business is running "in excess of $3 million" a year. It is getting a major share of the advertising promotion. Like "AERO-WAX," we have here a unitary mark notwithstanding the fact it consists of two words. "AERO SHAVE" (currently in the form "Aero Shave," with the same word arrangement, as exhibits show) is both a trademark and a designation of the product, although in saying this we do not mean to imply that, as a whole, it is not a good trademark or that "Shave" is the name of any product. Here "Aero" in the mark is bound, we think, to have the same suggestive significance as the "aero" in appellant's mark but we also think, in view of the fact that both products are aerosol-packaged, that purchasers would not take this common syllable *by itself* as an indication of origin. We can see no likelihood of confusion, mistake or deception of purchasers by the concurrent use of "AERO SHAVE" or "Aero Shave" on appellee's aerosol shaving lather and "aeromagic" on appellant's named aerosol-packaged products.

The last mark, an aerosol-packaged product like "AERO SHAVE," is "AERO SNOW," a decorative artificial snow in which a business of some $300,000 a year is done. This mark was adopted in 1952 and no registration of it is of record. Our views thereon correspond to those expressed with respect to "AERO SHAVE."

We have reached a different result from the board by a different approach from that which it appears to have taken.

The basic consideration motivating its conclusion that confusion would be likely appears to have been that purchasers familiar with appellee's marks (most if not all of them, apparently) "would reasonably assume, upon seeing 'AERO-MAGIC' for aerosol packaged starch, tar remover, or a dust laying compound that such products are *other items in opposer's line* of household products. [Emphasis ours.]" This would be valid reasoning if it had been shown that there was any consciousness on the part of purchasers that appellee has a "line" of products sold under marks beginning with "Aero." But so far as the record shows, the purchasing public is as likely to think that appellee's products are products having *different* origins. Taking only appellee's two largest selling and most promoted items as an illustration of the point, the record does not show and we do not believe that purchasers are generally aware that "AERO-WAX" (with a big "O" and flying motif) has a common origin with "Aero Shave," an aerosol-packaged product wherein the "Aero" portion of the mark carries an entirely different suggestion. Why, therefore, should anyone think that the producer of either of these products has a "line." There is nothing in common about the labeling, the backgrounds, or the typography to convey such an idea and the record makes no showing that there has ever been any advertising tending to give the public the idea that there is a relation between the various products discussed above. We believe the basic premise underlying the board's decision —*public* consciousness of a "line of products"—is non-existent; or, at least, wholly unproven.

We see no reason, therefore, to assume that any purchaser, seeing an "aeromagic" (with star over the "i") product, would think it was a part of any producer's "line," other than possibly that of appellant who alone produces different aerosol products bearing the identical mark "aeromagic." We think this con-

clusion justified particularly in view of the way in which appellee has used its divers "Aero" marks.

The decision of the board is reversed.

Reversed.